IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH KOUBA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 11211 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| PATRICK FLYNN; MICHAEL SWEENEY; GERALD PAULI; CHARLES DECOLA, LARRY ALEXANDER; ANTHONY LAMY; KEVIN WAGONER; FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and LOCAL 701 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In a five count amended complaint plaintiff Joseph Kouba sued defendants Patrick Flynn, Michael Sweeney, Gerald Pauli, Charles DeCola, Larry Alexander, Anthony Lamy, Kevin Wagoner, Fidelity and Deposit Company of Maryland ("F&D"), and Local 710 (the "Local"), International Brotherhood of Teamsters ("IBT") seeking to recover the salaries paid to the individual defendants while they were allegedly embezzling funds and concealing the poor financial condition of the Local. The action is brought under § 501(b) of the Labor Management Report Disclosure Act ("LMRDA"), 29 U.S.C. § 501(b), which authorizes a union member to sue on behalf of the union any officer for breach of fiduciary duty, if the union or its governing board has refused to so. Count I and II are brought against Flynn for violating § 501 of the LMRDA. Count III is a claim against the other officer defendants for failing to stop Flynn's alleged breaches. Count IV is a state law claim for breach of fiduciary duty against Flynn. Count V is a claim

against F&D for recovery under a statutorily mandated insurance policy issued by F&D to the Local to protect against loss as a result of fraud or dishonesty by the Local's officers. No claims are brought against the Local, which was named as a necessary party under Fed. R. Civ. P. 19. On March 1, 2018, plaintiff dismissed his claims against defendants Lamy, Wagoner, Alexander, and DeCola. Plaintiff has now moved for summary judgment against Flynn, Pauli and Sweeney (the "individual defendants") and against F&D. The individual defendants and F&D have moved for summary judgment against plaintiff. For the reasons described below, the individual defendants and F&D's motions for summary judgment are granted and plaintiff's motion is denied.

## BACKGROUND

Plaintiff is a member of the Local. Flynn is the former Secretary-Treasurer and Chief Executive Officer of the Local. He was the highest paid Local official in the IBT from 2010 through 2012, earning a salary of approximately $435,000 per year. Plaintiff's complaint charges that while he was employed by the Local, Flynn "embezzled" 1,383 gift cards purchased by the Local, worth $58,325. The complaint contains detailed allegations as to how Flynn carried out this "embezzlement," most, if not all, of which are based on a July 18, 2014 report to IBT General President James P. Hoffa from the Independent Review Board ("IRB") recommending that the Local be placed in Trusteeship to correct financial malpractices and corruption. The IRB is a court-supervised investigatory body created by a consent decree between the IBT and the U.S. Attorney General in an action pending in the Southern District of New York.

As a result of the IRB investigation, the IBT placed the Local under Trusteeship and removed the individual defendants from their positions. The IBT brought internal disciplinary

charges against each of the individual defendants and barred them from being employed by the Local or and IBT-related entity.

Flynn settled the charges against him and was: (1) permanently barred from holding any elected or appointed position with the Local or any IBT entity; (2) not allowed to seek or accept any salary or payment from the Local or any IBT affiliated entity; and (3) suspended from membership in the Local and the IBT for five years. In addition, he paid the Local $58,000, the amount of gift cards that the IRB asserted was unaccounted for or "embezzled," or not used for the purposes authorized.

In March 2015, Sweeney settled the charges against him, agreeing: (1) permanently not to seek or accept any elected or appointed office of the Local or any IBT related entity; and (2) permanently not to accept any salary payments or benefits from the Local or any IBT entity. Pauli went to a disciplinary hearing and IBT President Hoffa imposed a penalty: (1) permanently disqualifying Pauli from seeking, accepting, or holding any office with the Local; (2) disqualifying Pauli from employment with the Local or any IBT affiliated entity for three years; and (3) barring Pauli from receiving any payments, salary or other monies from the Local.

Under the Local's constitution and bylaws, the principal officer's compensation is set every three years at a nomination meeting for the election of officers held in the September prior to the beginning of their new terms of office in January. An officer's compensation is comprised of an annual base salary, which had remained between $80,000 and $85,000 for 2004 through 2014, and a commission, based on a fixed percentage rate of the total annual dues collected from the Local members. Prior to his first election as Secretary-Treasurer for the term beginning January 2014, Flynn requested that the commission rates for each of the officers be reduced by 1%. At the

September 2012 nomination meeting he requested that the rates be dropped by .5%, leaving the commission rates for the Secretary-Treasurer at 3.5%, President at 2.5% and Vice-President at 1.5%.

The Secretary is required to report on the financial condition of the Local at each January membership meeting. Flynn's practice was to read the two page preliminary summary of the financial condition prepared by the Local's outside auditors, Legacy Professional LLP ("Legacy"), which conducted the annual audits of the Local. During the periods in question, Legacy would complete the annual audit/financial statements and prepare the required LM-2 Report of the Local's financial condition, which was to be filed with the United States Department of Labor. The financial statements and LM-2 Reports were completed in February or early March. The LM-2 Report was filed at that time and was available on-line at the Department of Labor website. LM-2 Reports were filed by Legacy for 2009, 2010, 2011, 2012 and 2013, and annual audits were prepared and maintained by the Local for each year. The Local's Comptroller prepared monthly Trustee Reports that showed dues collected, expenses, liabilities and assets as required by the IBT. These reports were reviewed by the Local's Trustees and then submitted to the IBT. All LM-2s, financial statements, and Trustee Reports were available to members upon request.

In May 2012, the IBT conducted a routine internal audit of the books and records of the Local. That audit uncovered a number a discrepancies in the financial reporting records of the Local, including: (1) failure to properly account for and itemize the dispersal of gift cards purchased annually over a number of years; (2) failure to report deferred commissions owed to the officers and employees in late-2011 and 2012; (3) failure to properly reflect the Local's liability

4

for build-out costs of the Local's leased office space beginning in 2010; and (4) failure to properly report certain amounts owed by the Local to its Employee Pension Fund.

**DISCUSSION**

The parties have filed cross motions for summary judgment. Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The movant bears the burden of establishing both elements, Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990), and all reasonable inferences are drawn in the non-movant's favor. Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992). If the movant satisfies this burden, then the non-movant must set forth specific facts showing that there is a genuine issue for trial. Nitz v. Craig, 2013 WL 593851 at *2 (N.D. Ill. Feb. 12, 2013). In doing so, the non-movant cannot simply show there is some metaphysical doubt as to the material facts. Pignato v. Givaudan Flavors, Corp., 2013 WL 995157, at *2 (N.D. Ill. March. 13, 2013) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find in favor of the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Union officers are fiduciaries that "occupy positions of trust in relation to such organization and its members as a group." 29 U.S.C. § 501(a). The scope of this duty is "drawn from the Restatement of Agency in an effort to incorporate the whole body of common law precedent defining the fiduciary obligations of agents and trustees," taking into account "the special problems and functions of a labor organization." Hood v. Journeymen Barbers, 454 F.2d

5

1347, 1355 (7th Cir. 1972). Courts look to state common law to determine whether particular acts violate § 501(a). Guzman v. Bevona, 90 F.3d 641, 649 (2d Cir. 1996) ("Courts fashion federal law consistent with the aims of the statute, but taking guidance from state common law.").

Section 501(a) of the LMRDA requires union officers "to hold [the Union's] money and property solely for the benefit of the organization and its members." 29 U.S.C. § 501(a). Union officers would generally be guilty of breach of trust under this Section, however, only when acting beyond their authority. As the Seventh Circuit noted in McNamara v. Johnson, 522 F.2d 1157, 1163 (7th Cir. 1975):

> Union officers will not be guilty of breach of trust under this section when their expenditures are within the authority conferred upon them either by the constitution and bylaws, or by a resolution of the executive board, convention or other appropriate body including a general meeting of the members not in conflict with the constitution and bylaws.

All of plaintiff's claims are based on his allegations that Flynn breached his fiduciary duties to the Local. He raises three distinct claims. First, plaintiff argues that for the years 2010 through 2012, Flynn paid himself compensation in excess of a salary cap the membership had imposed at a 2009 meeting.

In addition to his position with the Local, from 1997 until January 2010 Flynn served as an IBT Vice-President. Under Article 5, § 1(a) of the IBT Constitution, as a Vice-President Flynn's combined salary from the IBT and the Local could not exceed the IBT's General President's salary, which was approximately $295,000. Flynn's total compensation, salary and commissions from the Local for the years 2003 through 2009 was always less than $200,000.

In the September 2009 meeting, Flynn made a motion to place a limit on salaries. The minutes reflect:

6

SECRETARY-TREASURER PATRICK FLYNN MOVED THAT WHILE ARTICLE V (5) § 1(A) OF THE INTERNATIONAL CONSTITUTION IMPOSES A SALARY CAP ON INTERNATIONAL EMPLOYEES THIS DOES NOT APPLY TO LOCAL 710 EMPLOYEES, THAT NONE THE LESS THIS PROVISION SHALL APPLY TO ALL OFFICERS AND BUSINESS AGENTS OF LOCAL 710.

At the time he made the motion, Flynn was still an International Vice-President and was subject to the limit imposed by the International Constitution. The obvious intent of the motion was to ensure that the Local's lower officers, who were not subject to the International Constitution limit, would not make more than the senior officer.

Flynn resigned from his IBT position in approximately January 2010. In October 2010 he sought advice from the Local's legal counsel, Marvin Gittler, as to whether the salary motion approved at the September 2009 nomination meeting continued to subject him to the International salary cap.

On October 21, 2010, Gittler responded, concluding that because Flynn was no longer an IBT Vice-President the salary cap imposed by the International Constitution no longer applied to him. He further opined that:

> After review and consideration, I am of the opinion that the language of the motion applied only while you held the position of International Vice-President. The salary cap does not now apply to any officers or business agents of Local 710.

Gittler further informed Flynn that although not required, Gittler believed that it would be appropriate for Flynn to advise the Local's Executive Board of Gittler's conclusions. He concluded his letter by stating, "[a]bsent any disagreement by the elected officials of the Local, the International employee salary cap should not be interpreted as now or in the future applying to any local union officer or business agent."

Taking Gittler's advice, Flynn raised the issue at the October 29, 2010, Executive Board meeting. The minutes of that meeting indicate that the board discussed the issue at length and finally adopted Gittler's recommendation relating to the salary structure for the Local's officers. The court agrees with Flynn that based on these undisputed facts there was no breach of fiduciary duty. Flynn's salary was approved by the members at the September 2009 meeting and later construed by the Executive Board after the advice of counsel. Certainly, these facts do not support a conclusion of a willful and deliberate breach that would support disgorgement of his salary. See Kerr v. Shanks, 466 F.2d 1271, 1276-77 (9th Cir. 1972) (disgorgement appropriate relief for willful and deliberate breach).[1]

Next, plaintiff claims that Flynn breached his fiduciary duty by "repeatedly and egregiously" failing to inform the membership of the Local's financial condition. According to plaintiff, Flynn filed false LM-2 Reports with the Department of Labor, failed to disclose that the Local was hundreds of thousands of dollars in arrears to its Officers, willfully refused to follow this auditors' advice to report debts, and never told the members how much he was actually making. The facts, however, do not support plaintiff's claims.

First, it is undisputed that the LM-2s were prepared by Legacy, the Local's outside auditors. Despite all the rhetoric in plaintiff's brief, he makes no claim that Legacy and Flynn where in some sort of agreement to hide the Local's true financial condition from the members. As noted, at each January membership meeting Flynn provided an oral report to the membership on the financial condition of the Local. He did this by reading the summary of the conditions

---

[1] Plaintiff complains that the individual defendants did not produce the letter in discovery, but admits that it was produced by the Local, and there is no dispute as to the authenticity of the letter.

provided by Legacy. His reports are reflected in the minutes and a copy of the Legacy summary was filed with the minutes. Legacy prepared audited financial statements which were available to all members.

Much of plaintiff's claim revolves around Flynn's alleged failure to inform the membership about his decision to defer the officers' and employees' commission payments for 2011 and 2012. It is undisputed that 2011 was a difficult year for the Local. Flynn acknowledged this at the January 2012 meeting. Beginning in the fourth quarter of 2011, Flynn exercised his express authority as Chief Financial Officer to defer the payment of the commission portion of the officers' and employees' salaries so that the Local could pay other obligations. Legacy determined that these "deferred commission obligations" did not need to be reported as a line item on the balance sheet under the "modified cash basis of accounting that it believed was required under the Department of Labor published guidelines. Legacy also determined that these deferred commissions would not be reported on the LM-2s. Legacy did conclude, however, that if the amount of deferred commissions became material they would be noted in a footnote on the financial statements, but not as a line item on the balance sheet. As a result, the 2011 financial statement prepared by Legacy contains no reference to deferred commissions, even in a footnote, because as of December 31, 2011, those deferred commissions totaled only $68,559. In the 2012 Legacy financial statement, when the year-end deferred commissions totaled $599,234, Legacy disclosed them in a footnote but not as a separate liability on the balance sheet because they had not become due and would not become due until Flynn decided they had to be paid.

The result of Legacy's method of disclosing the deferred commissions in a footnote, rather than as a line item, meant that the commissions were not part of the summary that Flynn read to the

members at the January meetings and thus the membership was unaware of the true financial condition when it approved the Officers' salaries at the 2012 nomination meeting.  Plaintiff claims that this amounts to a willful breach of fiduciary duty by Flynn.  But Flynn simply reported the finances as prepared by Legacy.  The IRB report suggests that the Legacy auditor and Flynn were aware of the requirement to report the deferred commission regardless of the method of accounting used, but Legacy fought that conclusion and no action was ever taken against it.  Thus, it is clear from the record that Flynn relied on Legacy to determine how and to what extent the deferred commissions should be reported.

    The same is true for plaintiff's claims, again based entirely on the IRB report, that defendants concealed a loan between the Pension Fund and the Local for the furniture and furnishings at the Local's leased office at the Fund's new Mokena facility, and that defendants concealed payments owed by the Local to its employee pension plan.  It is undisputed that Legacy improperly included the cost of the build-out for the Local's leased space in the lump sum monthly lease payments, and improperly characterized the build-out costs as a loan to be repaid over the course of the lease.  But Legacy corrected this error in the 2011 and 2012 financial statements and in the LM-2 Reports, characterizing the outstanding liabilities and corresponding assets as leasehold improvements.

    As to the payments owed to the Pension Plan, which were calculated at year end 2011, the IRB concluded that this should have been included as an outstanding liability on the Local's 2012 Trustee Reports, the 2011 Financial Statements, and the LM-2 Reports prepared in 2012.  Legacy was of the opinion that the pension calculations did not become liabilities until they were not paid when due, which for calendar year 2011 was September 15, 2012.  Thus, Legacy reported the

potential liability in footnotes in each of the relevant years' financial statements. It did so based on its view that that was the proper method for reporting when using the modified cash basis method of accounting.

As the undisputed facts above demonstrate, Flynn relied on Legacy to make decisions as to how any potential liabilities were to be disclosed on the financial statements and LM-2s. Whether Legacy's decisions were correct, or complied with generally accepted standards, or complied with how the IRB concluded they should be reported, is largely irrelevant. Flynn was entitled to rely on Legacy's professional advice. Absent any evidence that Flynn was lying to Legacy or that Legacy for some reason was in cahoots with Flynn to hide from the members information they needed to make informed decisions, plaintiff's claims do not demonstrate a breach of fiduciary duty and do not support a claim for disgorgement of Flynn's (or the other individual defendants') salaries.

Plaintiff's last claim in Count I is that Flynn "embezzled" $58,000 in gift cards. Again, this claim is based on the IRB Report, which details how Flynn "caused" the Local to purchase gift cards that where then given to Flynn to distribute for authorized purposes. According to the report, between October 2008 and December 2012 the Local purchased $267,500 worth of gift cards in denominations of $150 and $25. The Executive Board authorized purchases for each year to be given to the stewards. In some years the cards ($150) were given as Christmas gifts. The Executive Board also authorized the purchase of $25 gift cards to be given to members attending the membership meetings. The IRB Report charged Flynn with "causing" on several occasions the purchase of substantially more cards than necessary for the authorized purposes. After cards where distributed for authorized purposes, the remaining cards stayed in Flynn's

11

control. No one but Flynn knew exactly how many cards remained in his control. The surplus cards were never included in statements of the Local's assets or reflected in expenditures. According to the IRB report, from 2008 through 2012 there were 190 surplus $150 cards and 1,193 surplus $25 cards, worth a total of $58,329 that where under Flynn's control. Flynn had no documentation to demonstrate how those cards were used.

The IRB Report characterized Flynn's "use" of the excess gift cards as a "slush fund" or "embezzlement," a term that plaintiff repeats religiously. Yet, as defendants point out, there is no evidence Flynn converted any of these cards for his own personal use or to the personal use of others. Indeed, the only actual evidence is that Flynn distributed some of the "unaccounted for" cards for other Union business, such as purchasing meals for negotiating teams during contract negotiations.

Nonetheless, as noted above, Flynn settled the disciplinary charges against him by admitting that he failed to keep accurate records of the distribution of these cards which, as plaintiff argues, amounts to a breach of fiduciary duty. That breach, however, does not warrant disgorgement of his salary, or the salaries of the other individual defendants. Flynn has already paid for his failures. He has repaid the entire $58,000 in restitution, reimbursing the Local for any unaccounted for cards. He also lost his job. Requiring disgorgement of his salary would be totally punitive in nature. As noted by the Illinois Supreme Court in In re Marriage of Pagano, 154 Ill.2d 174, 190 (1992) (emphasis in original):

> When one breaches a fiduciary duty to a principle the appropriate remedy in within the equitable discretion of the court. While the breach may be so egregious as to require the forfeiture of compensation by the fiduciary as a matter of public policy, such will not always be the case. Punitive damages are *permissible* where a duty

12

based on a relationship of trust is violated, the fraud is gross, or malice or willfulness are shown; such an award is not automatic.

Because there is no evidence that Flynn appropriated the cards for his own personal use, but instead used the cards for Union business, albeit unauthorized, the court concludes that Flynn's breach was not willful and deliberate such as to require complete forfeiture of his compensation. The purpose of forfeiture of a fiduciary's compensation earned during the period of a breach is "not to compensate the injured party but rather to deprive the wrongdoer of the gains from the breach of duty and to deter disloyalty." Tully v. McLean, 409 Ill.App.3d 659, 681 (1st Dist. 2011). In the instant case, there is no evidence that Flynn profited from the breach, and any disloyalty has already been deterred by the resolution of the disciplinary charges. Consequently, the court grants summary judgment to Flynn on Count I.

In Count II, plaintiff alleges that Flynn's salary was unreasonable as a matter of law. The court rejects this claim outright. First, Flynn's and the other officers' salaries were set according to the Local's Constitution and bylaws. Size alone of an officer's salary is not "good cause" under § 501(b) to file a § 501(a) action. See e.g., Kausler v. Campey, 788 F.Supp. 423, 425 (E.D. Mo. 1992). As defendants point out, Flynn's predecessor as Secretary-Treasurer of the Local received a significantly ($150,000) higher salary than Flynn, at a time when the Local's dues where approximately $1 million less annually. Additionally, the Local's method of compensating its officers (salary, plus commission based on percentage of dues collected) has never been questioned by the IBT or the International General Treasurer. Under the International Constitution the General Secretary Treasurer can unilaterally reduce an officer's salary when there is an adverse change in the financial condition of the Local. Yet, the International has never taken

13

such action.   Because there is no evidence that Flynn's salary was unreasonable as a matter of law, the court grants summary judgment to Flynn on Count II.

Because the claims against the other individual defendants are based entirely on their alleged failure to protect the Local from Flynn and the same alleged failures of reporting on the LM-2 Reports, the court grants summary judgment to the individual defendants on Count III.

Because Count IV is essentially the same claim against Flynn as Count I, but brought under Illinois law, the court grants summary judgment to Flynn on Count IV.   Finally, because plaintiff's claims against F&D are based on a failure to pay the bond as a result of the individual defendants' fraud, the court grants summary judgment to F&D on Count V.

## CONCLUSION

For the reasons stated above plaintiff's motion for summary judgment [Doc 145] is denied, the individual defendants' motion for summary judgment [Doc 142] is granted, and F&D's motion for summary judgment [Doc. 138] is granted.

**ENTER:** **March 27, 2019**

Robert W. Gettleman
United States District Judge